UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA

    - against -

CHRISTOPHER FINAZZO,

          Defendant.
------------------------------------------------------------X

**MEMORANDUM & ORDER**
10-CR-457 (RRM)(RML)

ROSLYNN R. MAUSKOPF, United States District Judge.

      Following a three-week trial, a jury found defendant Christopher Finazzo guilty of one

count of conspiracy to commit mail fraud, wire fraud and the Travel Act; fourteen counts of mail

fraud; and one count of wire fraud.  After its verdict on the guilt phase, the jury also heard

additional evidence and rendered a special forfeiture verdict, finding that $25,790,822.94

constituted proceeds of his crimes.[1]  Prior to the jury reaching these verdicts, Finazzo moved for

a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure.  The Court

reserved decision.  Finazzo now renews his motion under Rule 29.  He also moves to vacate the

judgment under Rule 33 and to arrest the judgment under Rule 34.  (*See* Def.'s Ltr. Mot. (Doc.

No. 263).)  The government filed its opposition to the motions, (*see* Govt.'s Opp'n Br. (Doc. No.

267), to which Finazzo has replied, (*see* Def.'s Reply Br. (Doc. No. 277).)  For the following

reasons, the Court DENIES the motions.

**BACKGROUND**

I. The Indictments

      Finazzo was first indicted on June 8, 2010.  (Original Indictment (Doc. No. 1).)  The

original indictment described a "fraudulent scheme" in which Finazzo, an executive at the

clothing retailer Aéropostale, secretly received approximately fifty percent of the profits from

---

[1] All motions directed at the forfeiture verdict will be addressed by separate Memorandum and Order.

certain transactions between Aéropostale and South Bay Apparel, Inc. ("South Bay"), a clothing vendor controlled by co-defendant Douglas Dey,[2] in exchange for "caus[ing] Aéropostale to use South Bay as a vendor to purchase merchandise at rates that were less favorable to Aéropostale than the prevailing market rate." (Original Indictment at ¶ 7.)

On December 14, 2010, the government filed a superseding indictment ("S-1") against Finazzo. S-1 alleged that Finazzo "deprived Aéropostale both of the opportunity to seek lower prices for merchandise it purchased from South Bay and the opportunity to purchase that merchandise from other vendors." (S-1 (Doc. No. 49) ¶ 7.) After this Court denied Finazzo's motion to dismiss S-1 on August 24, 2011 (*see* Order (Doc. No. 59)), the government filed a second superseding indictment ("S-2") on September 9, 2011. (S-2 (Doc. No. 62).) S-2 charged that Finazzo "defrauded" Aéropostale by

> "(1) depriving Aéropostale of the opportunity to make informed decisions, thereby preventing Aéropostale from seeking lower prices for merchandise it purchased from South Bay and the opportunity to select other vendors based upon price, quality and timely delivery; and (2) causing Aéropostale to pay higher prices on merchandise it purchased from South Bay than were available from other vendors, thereby increasing South Bay's profits and the amounts Dey paid Finazzo."

(S-2 at ¶ 9.) Further, S-2 alleged that "Finazzo repeatedly rebuffed requests . . . to move a portion of the t-shirt business from South Bay to an overseas vendor that could provide the t-shirts for a significantly lower price" and that Finazzo rejected a specific alternative vendor that would have saved Aéropostale approximately $300,000 as compared to placing an order with South Bay. (*Id.*) S-2 alleged seventeen counts: (i) conspiracy to commit mail fraud and wire fraud and conspiracy to violate the Travel Act (Count One); (ii) mail fraud (Counts Two through

---

[2] Dey pled guilty to one count of conspiracy. (*See* Doc. No. 148.)

Fifteen); (iii) wire fraud (Count Sixteen); and (iv) making a false statement in a report required to be filed with the United States Securities and Exchange Commission (Count Seventeen).[3]

Finazzo moved to dismiss S-2 on October 3, 2011 (Mot. to Dismiss (Doc. No. 69)); this Court denied his motion on February 19, 2013 (Order (Doc. No. 182).) For reasons similar to those in the Court's order denying Finazzo's motion to dismiss S-1, the Court denied the motion to dismiss S-2 in part, rejecting Finazzo's challenge to what he styled the "lost opportunity" charge – that he deprived "Aéropostale of the opportunity to make informed decisions, thereby preventing Aéropostale from seeking lower prices for merchandise it purchased from South Bay and the opportunity to select other vendors based upon price, quality and timely delivery" – and finding that S-2 did allege that Finazzo contemplated harm to money or property as 18 U.S.C. §§ 1341 and 1343 require. In so ruling, the Court relied upon the "well-established proposition that the 'interest of a victim in controlling his or her own assets' is a 'property[] interest protected' by the mail and wire fraud statutes." (Doc. No. 182 at 7 (quoting *United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007) and citing *United States v. Wallach*, 935 F.2d 455, 462-63 (2d Cir. 2001)).)

II.    The Evidence at Trial

Finazzo's current motions address only Counts Two through Sixteen, the substantive mail and wire fraud counts. He does not challenge his conviction on Count One, conspiracy to commit mail fraud, wire fraud, and to violate the Travel Act (18 U.S.C. § 1952(a)(3)), in violation of 18 U.S.C. § 371. Moreover, as to these substantive fraud counts, Finazzo does not challenge the sufficiency of proof with respect to his use of the mails and wires.[4] Rather, he

_____

[3] The Court granted the government's motion to dismiss Count Seventeen in advance of trial. (*See* Apr. 30, 2013 Order.)

[4] In any event, the government adequately proved the use of the mails and the wires to sustain these convictions. On fourteen occasions, Aéropostale sent checks via United Parcel Service (UPS) from New Jersey to South Bay in

takes issue only with the proof as to whether he knowingly and willfully participated in a scheme to defraud Aéropostale of money or property. *See Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004) (setting forth the elements of mail and wire fraud). Given this focus, the Court discusses only the evidence related to the challenged elements.

As explained below, the government put forward ample evidence to support the jury's verdict as to the mail and wire fraud counts. Simply put, the government presented considerable credible evidence of Finazzo's scheme, showing that Finazzo had – and hid – a financial relationship with South Bay from Aéropostale and that he controlled the flow of Aéropostale's business to South Bay. The government also presented evidence that Aéropostale would have wanted to know about Finazzo's financial interests in South Bay and its related entities, and that, had Finazzo not had such interests, additional profits may have accrued to Aéropostale.

*A. Financial Interests in South Bay and its Affiliated Entities*

Finazzo's former accountant and cooperating government witness, Paul Conefry, testified about Finazzo's and Dey's joint business ventures. Shortly after Finazzo was hired by Aéropostale in 1996, Conefry met with Finazzo and Dey about a new business venture they were embarking upon together – South Bay. (Transcript of Trial Proceedings ("Tr.") at 821.) Finazzo and Dey planned that South Bay would do business with Aéropostale and other companies. (*Id.*) During this initial meeting, Conefry cautioned Finazzo and Dey about their plans because "if you have a relationship with a vendor as an employee of a company it could create a problem." (*Id.*) Finazzo stated in response that he did not think Aéropostale would "go for it." (*Id.*) Nevertheless, Finazzo and Dey agreed that South Bay would serve as a vendor to Aéropostale. Dey was the sole owner of South Bay. (Tr. at 824.) Finazzo, in turned, formed C&D Retail

---

Calverton, New York. (*See* Tr. 115-20; Govt. Exs. 87-100.) Additionally, the government presented evidence that Aéropostale wired money to South Bay on June 9, 2005. (Tr. 1444-45; Govt. Ex. 101.)

Consultants ("C&D") in part as a means to facilitate funneling of Aéropostale's business to South Bay. (*Id.*) Finazzo used his position at Aéropostale to direct business to South Bay, and South Bay's business grew rapidly. (*Id.* at 823.)

Conefry was the accountant to both South Bay and C&D. (Tr. at 822.) In that capacity, Conefry directed payments from South Bay to C&D as instructed by Finazzo and Dey and pursuant to their agreement. (*Id.* at 825.) Over time, Dey and Finazzo agreed that Finazzo would receive fifty percent of South Bay's profits, paid as consulting fees from South Bay to C&D. (*Id.* at 826.) Conefry also testified that Finazzo and Dey jointly owned three corporations, Vertical Line Apparel, Inc., Vertical Line Apparel II, Inc., and Vertical Line Apparel III, Inc. (the "Vertical Line entities"). (*Id.* at 843.) The Vertical Line entities also served as vendors to Aéropostale. (*Id.* at 342.) Dey and Finazzo also jointly owned other South Bay-named entities, including South Bay Sports Plex, South Bay Ticketing, and South Bay Knitting.[5] (*Id.* at 844; *see also* Govt. Ex. 356.) Conefry prepared the tax returns for all of these entities as well. (Tr. at 844.)

Each year that Conefry prepared the taxes for South Bay and C&D, he cautioned Finazzo and Dey that, as South Bay's business with Aéropostale grew "bigger and bigger," Finazzo should disclose their relationship to Aéropostale, and Conefry warned that they needed to be very careful about categorizing the payments from South Bay to C&D as consulting fees because they were not. (Tr. at 830-33.) Around the time that Aéropostale was going public, another discussion to this effect occurred and Finazzo responded to Conefry that "it's gone along so far so we will just continue." (*Id.* at 832.) During a similar conversation, Finazzo at one point also

---

[5] South Bay Knitting owned ninety-nine percent of another South Bay entity, South Bay Peru. (Tr. at 844.)

said that he was going to be leaving Aéropostale soon and that it was "too late to do anything about it now." (*Id.* at 839.)

The former Chief Financial Officer of Aéropostale, Michael Cunningham, testified that Finazzo failed to disclose his ownership interest in South Bay or any related-party transactions with South Bay on his director and officer ("D&O") questionnaires and his related-party transactions questionnaires that Finazzo was required to complete on a regular basis for Aéropostale. (Tr. at 79-85.) For example, the related-party transaction questionnaires asked Finazzo whether he "had a material financial interest [more than any 10-percent interest in an entity that the company transacts business with] in a transaction or a proposed transaction to which Aéropostale was or is to be a party to?" (*Id.* at 90.) Finazzo consistently and falsely answered "No" to this question. (*Id.*)

Similarly, the General Counsel of Aéropostale, Edward Slezak, testified that Finazzo lied on his D&O questionnaires about his relationship with South Bay. On these questionnaires, Finazzo stated he received no bribes or kickbacks or other favorable treatment from third-party vendors and that he did not partake in any financial transaction with a third-party vendor. (Tr. at 406-19.) The former Chief Executive Officer of Aéropostale, Julian Geiger, testified as well that Finazzo never disclosed his financial interests in South Bay. (*Id.* at 1056.)

B. *The Graphic T-Shirt and Fleece Business*

Geiger testified that Aéropostale started doing business with South Bay based on Finazzo's recommendation. (Tr. at 1010.) Aéropostale bought primarily graphic t-shirts and fleece products from South Bay. (*Id.* at 1011.) Geiger testified that from 2002 to 2006, Finazzo was responsible for vendor selection and vendor pricing for merchandise. (*Id.* at 1010.) Cunningham also testified that, as Chief Merchandising Officer, Finazzo was "responsible for

the overall final price that was being negotiated with the vendors," including South Bay.  (*Id.* at 99.)  Cunningham testified that the "single most important factor in determining" Aéropostale's profitability is the cost it pays for its goods.  (*Id.* at 97.)

As an example of the level of control Finazzo exercised over the graphic t-shirt business, Cunningham testified that Geiger suggested to Finazzo that he move twenty-five percent of the t-shirt business to overseas vendors in order to obtain a price lower by $1 to $1.50 per t-shirt, representing an approximately $5 million cost-savings to Aéropostale.  (Tr. 123, 125, 126.)  Finazzo said that he would look into it, but grew more and more agitated each time Geiger confronted him about it.  (*Id.* at 124-25.)  Geiger corroborated this testimony.  He believed that Aéropostale was paying about $5 per t-shirt produced domestically by South Bay and believed he could get t-shirts from overseas vendors for $3.50 each, recognizing it would take more time for overseas vendors to deliver product to the United States.  (*Id.* at 1040.)  He asked Finazzo to move twenty-five percent of the t-shirt business to overseas vendors, and Finazzo said he would do so.  (*Id.* at 1041.)  By moving that business overseas, Geiger estimated that Aéropostale would have earned an additional $6 million in profit.  (*Id.*)  Finazzo never moved twenty-five percent of the graphic t-shirt business overseas as directed.  (*Id.*)  Over time, as Geiger and pressed Finazzo on the issue, Finazzo became "agitated."  (*Id.* at 124.)  During one of the last meetings on moving to overseas t-shirt vendors, Cunningham recalled that Finazzo again became "agitated" and "said this meeting is over and walked out the door and slammed the door shut and the whole room vibrated."  (*Id.*)

Geiger also testified that, whenever Finazzo was questioned about the relatively low profit margins that Aéropostale earned on its graphic t-shirt business, Finazzo reacted strongly: "On many occasions, he would take his hands and hit them against the table and basically say

why are people looking so closely at this? At one point . . . he told me, I wasn't allowed to ask him any questions about graphic t-shirts for a month." (Tr. at 1036.) Geiger testified further that while he was the Chief Merchandising Officer, Finazzo had the final say on the number of orders for graphic t-shirts that Aéropostale placed. (*Id.* at 1055-56.)

Additionally, many former and current employees of Aéropostale who worked under Finazzo during the relevant time period testified about his level of control over the graphic t-shirt business, specifically as it related to South Bay. For example, Jennifer Heiser, who reported directly to Finazzo, testified that she tried to place graphic t-shirt orders with vendors in Singapore but Finazzo discouraged her from doing so. (Tr. at 193.) Instead, she placed ninety-seven to ninety-nine percent of her graphic t-shirt orders with South Bay. (*Id.* at 192.) Similarly, John DiBarto, who ran the entire men's division at Aéropostale and reported directly to Finazzo, testified that Finazzo negotiated the prices for graphic t-shirts with South Bay. DiBarto stated he rarely attempted to negotiate prices with South Bay because "that was Chris' thing. He controlled production . . . [T]hat was his baby from the beginning, so we're really, you know, we did whatever he wanted" for graphic t-shirts. (*Id.* at 644-45, 652.) DiBarto further explained that "every now and then" his team would ask for discounted prices on graphic t-shirts from South Bay, but never sought an overall reduction in price of a dollar or more because when he tried to "mess with [the prices] a little bit, it wasn't worth it, Chris would get angry . . . . It caused a lot of stress." (*Id.* at 682-83.)

With respect to Finazzo's control over the fleece business, an employee of Aéropostale, Jinah Jung, who worked under Finazzo, offered testimony about the prices Aéropostale paid for South Bay fleece. Specifically, Jung testified about an e-mail she sent to Finazzo in February 2005, where she wrote:

> Hi, Chris. I just left you a voicemail regarding the South Bay woman's [sic] graphic fleece program for 450,000 units. Maria Peakes advised that you agreed upon $6.85, which I think is really high, because I know I can get it for a low $6 range. For 450,000 units, I feel that we can do better. I will not argue for it if it's something you've already committed to. However, we could have saved approximately $300,000. Please advise if you'd still like to proceed with the $6.85, and I'll put it to bed. Thanks.

(Tr. at 605-06; Govt. Ex. 261.) Finazzo responded to Jung's email, stating, "Yes, that is the price I agreed with Doug [Dey] on. He did not make any money last holiday, and he is a valued partner, so good callout. As we get closer to holiday, we can discuss. This is his program." (Tr. at 607-08, Govt. Ex. 261.)

South Bay's graphic t-shirt business with Aéropostale was lucrative to both Finazzo and Dey. They carried out their agreement to split South Bay's profits on a fifty-fifty basis. An FBI agent, Michael Braconi, testified regarding the amount of money that Aéropostale paid to South Bay and the Vertical Line entities, and in turn the amount of money South Bay paid to C&D, over the course of Finazzo's employment at Aéropostale. First, Braconi testified that Aéropostale paid South Bay and the Vertical Line entities $267,078,261.41 between June 2002 and November 6, 2006, the day before Finazzo was terminated. (Tr. at 1516; Govt. Ex. 121.) During that same period, South Bay paid C&D $21,223,831.41. (Tr. at 1517; Govt. Ex. 122.) Payments from South Bay Apparel to the other South Bay-named entities totaled $2,959,520 during that same period. (Tr. at 1520; Govt. Ex. 124.) From January 2004 to November 6, 2006, South Bay paid the Vertical Line entities $6,174,463.60. (Tr. at 1519; Govt. Ex. 123.) The sum of the latter two amounts – payments from South Bay to other South Bay entities and to the Vertical Line entities – totaled $9,133,983.60. (Tr. at 1522; Govt. Ex. 125.) Half of that amount – or fifty percent of that amount – was $4,566,991.80. (*Id.*) Thus, the sum of the payments from

South Bay to C&D and the payments from South Bay to other South Bay-named entities and the Vertical Line entities was $25,790,822.94.  (Tr. at 1523; Govt. Ex. 127.)

   *C.  Finazzo's Termination*

   Aéropostale learned about Finazzo's undisclosed interests in South Bay after undertaking an investigation into an allegation that Finazzo had instructed an Aéropostale employee to purchase an additional 100,000 units of product from a vendor who had supplied a hotel room in Las Vegas for Geiger's children.  (Tr. at 1056.)  During the investigation, Aéropostale obtained a copy of an email sent to Finazzo's work account from his personal attorney.  The email, dated August 24, 2006, attached a list of Finazzo's assets that his attorney had prepared.  (Tr. at 342; Govt. Ex. 356.)  In the email, the attorney asked Finazzo to review the values listed in the attachment and indicated that she would produce "revised wills" based upon them.  (*Id.*)  The email attachment was entitled "Christopher Finazzo family assets" and below the title read, "Corporations (50 percent) interests."  (*Id.*)  The attachment then listed Finazzo's assets in which he held a fifty-percent interest.  The named entities included the three Vertical Line entities, South Bay Knitting, South Bay Ticketing, South Bay Peru, and Sports Plex Inc.  (Govt. Ex. 356.) Finazzo was terminated on November 7, 2006.

   The termination meeting was recorded and played for the jury.  Geiger and Slezak confronted Finazzo about his ownership in the South Bay-named entities and the Vertical Line entities.  Attempting to explain, Finazzo stated that he lent money to Dey to set up a factory in Peru for South Bay Peru and that the Vertical Line entities were real estate holding companies and that he did profit from them.  (Govt. Ex. 20A.)  Finazzo also stated that he "never did anything that was against Aéropostale.  I always had Aéropostale's best interest in mind."  (*Id.*) Finally, Finazzo said that while he did not know what South Bay's profit structure was, South

Bay was "competitive with everyone." (*Id.*)  Nevertheless, Geiger explained that Finazzo was being terminated for cause for having personal financial interests in, and serving as an officer of, entities affiliated with South Bay.  (*Id.*)

### D.  *Finazzo's Financial Interests with South Bay and Related Entities*

Many witnesses testified that it was important for Aéropostale to know about any financial or other interest that Finazzo had in South Bay and its related entities.  For example, Cunningham testified that Aéropostale had to know whether its employees had an ownership interest or a relationship with one of its vendors because the company has to "make sure that all employees are acting with the best interest of the company . . . .  If an individual is either getting money or has a significant ownership stake in a vendor . . . without disclosing it to us – we don't know, we don't have the opportunity to understand, are we getting the proper value for the money, or is it benefiting that individual in a way that we don't know?"  (Tr. at 80.)  He also stated that if an employee is "receiving a benefit and if that employee is also involved in transacting business with that vendor, the prices that we pay may not be the best price or the fair market value for that product or service."  (*Id.* at 85.)  Cunningham further testified that the company was specifically concerned about Finazzo's relationship with South Bay when it finally learned of it in 2006 because they did not know if Finazzo was "acting in the best interest [of] Aéropostale but in his own interest and therefore we had no way of knowing if this was the best possible price we could get for T-shirts overall."  (*Id.* at 137.)

Slezak testified that with a related-party transaction, the company is concerned because the employee may be on "both sides of a transaction," meaning the employee had a "conflict of interest."  (Tr. at 324.)  Aéropostale wanted to know about such conflicts of interest because "you want to make sure that the company is getting the best possible deal, the best benefit of the

bargain and if someone is on both sides of a transaction, you have to do an analysis to make sure you feel comfortable that the company is getting a good deal or a fair deal." (*Id.* at 324-25.)

As to Finazzo's specific interest in South Bay, Slezak also testified that Finazzo was in a clearly conflicted position because he directed "what we made, how much we made, who got it, you know, who got the orders, who made the product." (Tr. at 364.) "And then he is also acknowledging that he is profiting on the other side by getting profit, as he used here, from South Bay, South Bay entities, whatever it might be." (*Id.*) Slezak continued, "what I felt was that he was on both sides of those transactions. There is no way that we got – we as Aéropostale got the benefit of the bargain or got the best market prices or got the best, you know, engagement with our vendor that we could possibly get. Honestly, I felt that every penny that Chris ever got from South Bay should have been ours." (*Id.* at 365.)

Geiger further testified that "relationships such as these could easily reduce our profitability and how much money we made." (Tr. at 1070.) In Geiger's view, these related-party transactions jeopardized Aéropostale's ability to make an arm's length deal and maximize its profitability. (*Id.* at 1071.) Moreover, Finazzo profiting directly from the Vertical Line entities, which served as vendors to Aéropostale, "would directly diminish Aéropostale's ability to maximize its profits because monies were going elsewhere that could have gone to the company." (*Id.* at 1073.) To put a finer point on it, Geiger testified that "any profits that [Finazzo] would have gotten . . . would have accrued to the company increasing its profitability, the value to the shareholders and made Aéropostale stronger." (*Id.* at 1078.)

Notwithstanding the importance of disclosure, Geiger and others testified that related-party transactions in and of themselves are not necessarily problematic. For example, Slezak testified that:

> Related-party transactions can be okay if they are disclosed. If our board of directors, if it's raised to the right executives in the company, CEO, CFO, general counsel, things like that, to make an analysis and then our board approves it and say it's not detrimental to the company, maybe it's beneficial to the company, whatever, and you disclose it, it's okay. You know, the problem is that if you don't disclose it, you have what happened here.

(Tr. at 373.) Slezak then further explained that, when an employee discloses a related-party transaction to him, Slezak would analyze both sides of the transaction, talk to the parties on each side of the transaction, and "get a full understanding of and disclosure about all of the terms and conditions of this whatever transaction might be." (*Id.* at 404.) Then, he would present his findings to the other executive officers, who would in turn, if they so decided, present the terms of the transaction to the board of directors. (*Id.* at 405.) The board of directors would then decide whether to move forward with the transaction. (*Id.*) Slezak explained that "you'd want to have your full board sign off unanimously and say they felt comfortable with allowing this type of relationship to go forward." (*Id.*) Slezak then stated none of this process ever occurred with respect to Finazzo's relationship with South Bay. (*Id.*)

Similarly, Cunningham testified that, while related-party transactions are not criminal or inherently flawed, the fact that one exists "means it needs to be evaluated to ensure that there is nothing wrong about the transaction." (Tr. at 142, 143.) Cunningham also testified that publicly traded companies often engage in related party transactions. (*Id.* at 143.)

### III. Jury Instructions and Verdict

At the close of evidence and after closing arguments, the jury was instructed on the law of mail and wire fraud. As part of those instructions, the Court told that jury that:

> [I]n order to prove a scheme to defraud, the government must prove that the alleged scheme contemplated depriving another of money or property. Property includes intangible interests such as the right to control the use of one's assets. This interest is injured when a victim is deprived of

> potentially valuable economic information it would consider valuable in
> deciding how to use its assets.

(Tr. at 2412; Court Ex. 2a (Doc. No. 262) at 19.)

The jury rendered a special verdict as to each mail fraud count and the sole wire fraud count. Each count listed on the verdict sheet asked the jury, if it found Finazzo guilty of the mail or wire fraud charge, to answer two additional questions: (1) whether its guilty verdict was "on the basis of intent to deprive Aéropostale of money," and (2) whether its guilty verdict was "on the basis of Aéropostale's right to control use of its assets." (Court Ex. 1 (Doc. No. 262).) For each mail and wire fraud count, the jury determined that Finazzo was guilty; that Finazzo was not guilty on the basis of intent to deprive Aéropostale of money; but that Finazzo was guilty on the basis of intending to deprive Aéropostale of its right to control use of its assets. (*Id.*)

## DISCUSSION

I.    Standards of Review

Rule 29 provides that, on a defendant's motion, the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "A defendant who challenges the sufficiency of the evidence supporting his conviction 'bears a heavy burden.'" *United States v. Velasquez*, 271 F.3d 364, 370 (2d Cir. 2001). "Not only must the evidence be viewed in the light most favorable to the Government and all permissible inferences drawn in the Government's favor, but the jury verdict must be upheld if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (citation omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) ("[T]he court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager

that no reasonable jury could find guilt beyond a reasonable doubt.'"). In determining a Rule 29 motion for judgment of acquittal, the court must "view pieces of evidence 'not in isolation but in conjunction.'" *United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 978 (2d Cir. 1990)).

In resolving Rule 29 motions, a court should "avoid usurping the role of the jury." *Guadagna*, 183 F.3d at 129. A court must "defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony." *United States v. Bala*, 236 F.3d 87, 93–94 (2d Cir. 2000). Moreover, a court cannot "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Guadagna*, 183 F.3d at 129 (internal quotation marks omitted). Therefore, the jury's verdict will be upheld even when it is based entirely on circumstantial evidence. *Jackson*, 335 F.3d at 180. "In fact, if the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." *Guadagna*, 183 F.3d at 129 (internal quotation marks omitted).

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. This rule "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Polouizzi*, 564 F.3d 142, 159 (2d Cir. 2009) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)). Courts must exercise Rule 33 authority "sparingly" and only in "the most extraordinary circumstances." *United States v. Cote*, 544 F.3d 88, 101 (2d Cir. 2008) (quoting *Sanchez*, 969 F.2d at 1414). The "ultimate test" in deciding whether to grant a Rule 33 motion is whether "letting a guilty verdict stand would be a manifest injustice." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005).

Finally, Rule 34 provides that "the court must arrest judgment" if "the indictment or information does not charge an offense." Fed. R. Crim. P. 34(a)(1); *see also United States v. Zisblatt*, 172 F.3d 740, 741 (2d Cir. 1949) ("Rule 34 is explicit as to the grounds upon which a motion in arrest of judgment will lie: (1) the indictment must fail to charge an offense.").

II.    Defendant's Arguments

Finazzo does not particularize his challenges to each of the substantive mail and wire fraud counts. Rather, he believes that each argument he makes warrants setting aside those counts under each of Rules 29, 33 and 34. Additionally, and as Finazzo himself recognizes, many of his arguments in support of these motions are similar to those he advanced in support of his motions to dismiss S-1 and S-2, which the Court previously rejected. Finazzo simply reframes these arguments in light of the current posture of the case. The Court addresses − and rejects − each of his arguments in turn.

A. *Jury Instructions*

Finazzo argues that the Court improperly instructed the jury on the definition of property, as that term is used in the mail and wire fraud statutes. The Court's instruction, Finazzo argues, allowed the jury to convict him simply for breaching the fiduciary duties he owed to Aéropostale by failing to disclose his interests in South Bay and its affiliates. A conviction on that basis, he contends, cannot stand in light of controlling precedent from the Second Circuit. Finazzo relies principally on *United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994) in support of this argument, a case which he believes plainly mandates granting his motions. The Court disagrees.

1. "Property" under the Fraud Statutes

The mail and wire fraud statutes make it unlawful for an individual to "devise or intend[ ] to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or

fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343. The

government's proof at trial must satisfy three elements to maintain a conviction for mail fraud or

wire fraud: (1) a scheme to defraud victims of (2) money or property through the (3) use of the

mails or the wires. *Fountain*, 357 F.3d at 255; *see also United States v. Wallach*, 935 F.2d 445,

461 (2d Cir. 1991). The mail and wire fraud statutes "use the same relevant language, [and] are

analyzed in the same way." *United States v. Slevin*, 106 F.3d 1086, 1088 (2d Cir. 1996).

With respect to the element of "money or property" at issue here, the government does

not need to prove that the defendant actually harmed the victim. *Mittelstaedt*, 31 F.3d at 1216.

Instead, "the government need only show that the defendant contemplated some actual harm or

injury." *Id.* (quoting *Wallach*, 935 F.2d at 461, and citing *United States v. Starr*, 816 F.2d 94, 98

(2d Cir. 1987), and *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir.

1970)). The contemplated harm must, moreover, be to "property right[s]." *McNally v. United*

*States*, 483 U.S. 350, 360 (1987); *see also Mittelstaedt*, 31 F.3d at 1217 (explaining that the fraud

statutes are "limited in scope to the protection of property rights"). Property rights protected by

the fraud statutes are to be "interpreted broadly." *McNally*, 483 U.S. at 356. The statutes

"extend to all kinds of property interests, both tangible and intangible." *United States v. Carlo*,

507 F.3d 799, 801-802 (2d Cir. 2007) (citing *Carpenter v. United States*, 484 U.S. 19, 25

(1987)); *see also Carpenter*, 484 U.S. at 25 (noting that the mail fraud statute's reach is not

limited to tangible, as opposed to intangible, property rights).

It is at this point in the recitation of the law that Finazzo takes issue. Finazzo has much to

say about what constitutes an intangible property right protected by the mail and wire fraud

statutes. His arguments suggest that there is great ambiguity in this area of the law, that there are

particular rules applicable to particular sets of facts, and particular exceptions to those particular

rules. However, an exploration of the law in the Second Circuit demonstrates that these arguments must be rejected.

In the Second Circuit, "the interest of a victim in controlling his or her own assets" is among the array of intangible property rights protected by the mail and wire fraud statutes. *Carlo*, 507 F.3d at 802 (citing *United States v. Walker*, 191 F.3d 326, 335 (2d Cir. 1999) and *United States v. Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998)); *see also Wallach*, 935 F.2d at 462 ("The 'right to control' has been recognized as a property interest that is protected by the mail fraud statute."). Protecting a victim's "right to control" makes sense, as "the right to control" is a "defining feature of most property." *Carlo*, 507 F.3d at 802. Other circuits also agree that a victim's right to control her assets is a property right protected by the fraud statutes. *See United States v. Gray*, 405 F.3d 227, 234 (4th Cir. 2005) ("A property owner has an intangible right to control the disposition of its assets."); *United States v. Welch*, 327 F.3d 1081, 1108 (10th Cir. 2003) ("We have recognized the intangible right to control one's property is a property interest within the purview of the mail and wire fraud statutes."); *United States v. Madeoy*, 912 F.2d 1486, 1492 (D.C. Cir. 1990) (explaining that the wire fraud statute protects "intangible property, as well as the right to decide how to use that property—even if a defendant's actions do not cause the property owner any monetary loss"); *United States v. Shyres*, 898 F.2d 647, 652 (8th Cir. 1990) ("We determine that the right to control spending constitutes a property right" protected by § 1341); *cf. United States v. Treadwell*, 593 F.3d 990, 999 (9th Cir. 2010) (upholding jury verdict finding that defendants, "through misrepresentation, intentionally deprived their victims of the opportunity to decide for themselves, on the basis of true and accurate information, whether or not to invest" in certain companies because "that is all an 'intent to defraud under 18 U.S.C. § 1343 requires"); *United States v. Catalfo*, 64 F.3d 1070,

1077 (7th Cir. 1995) (recognizing a victim's intangible property "right to control its risk of loss"); *United States v. Kerkman*, 866 F.2d 877 (6th Cir. 1989) (rejecting argument that depriving victim of its "intangible right to information" and "economically material information" is not protected by the fraud statutes); *United States v. Fagan*, 821 F.2d 1002, 1009 (5th Cir. 1987) ("We have stated that section 1341 is violated when an employee violates his duty to disclose to his employer economically material information which the employee has reason to believe would lead a reasonable employer to change its business conduct.").

The Second Circuit has further instructed that a victim's right to control her property is harmed when she is deprived "of information necessary to make economic decisions." *Rossomando*, 144 F.3d at 201 n.5. Put another way, the right to control "'theory is predicated on a showing that some person or entity has been deprived of potentially valuable economic information.'" *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) (quoting *Wallach*, 935 F.2d at 462-63). Put yet another way, a victim's right to control is injured by "'the withholding or inaccurate reporting of information that could impact on economic decisions.'" *D'Amato*, 39 F.3d at 1257 (quoting *Wallach*, 935 F.2d at 462-63); *see also United States v. Levis*, 488 F. App'x 481, 486 (2d Cir. 2012) (summary order) ("A defendant engages in wire fraud when he intentionally deprives a victim of potentially valuable economic information that could impact on economic decisions made by the victim.") (internal quotation marks and citation omitted); *Carlo*, 507 F.3d at 802 ("By causing the developers to make economic decisions about the viability of their real estate projects based on misleading information, Carlo harmed the developers' property interests."); *United States v. Walker*, 191 F.3d 326, 335 (2d Cir. 1999) ("The 'money or property' . . . element can also be satisfied when the defendant's scheme is intended to deprive its victims . . . of the right to control their own assets."); *United States v.*

*McDonough*, 56 F.3d 381, 390 (2d Cir. 1995) (upholding jury instruction that the jury could convict if it found that the object of the defendant's scheme was "to deprive . . . citizens and officials . . . of money or the right to control their money or both").

Guided by these Second Circuit standards, the Court instructed the jury in this case as follows:

> In addition to proving that a statement was false or fraudulent and related to a material fact, in order to prove a scheme to defraud, the government must prove that the alleged scheme contemplated depriving another of money or property. Property includes intangible interests such as the right to control the use of one's assets. This interest is injured when a victim is deprived of potentially valuable economic information it would consider valuable in deciding how to use its assets.

(Tr. at 2412; Court Ex. 2a at 19.) Finazzo takes issues with this instruction, both as to its phrasing and its content.

### 2. Phrasing

Finazzo first challenges the Court's instruction that "[p]roperty includes intangible interests such as the right to control the use of one's assets." (*Id*.) He first argues that this instruction was erroneous in using the phrase "such as" because it permitted the jury to convict upon a finding that Finazzo intended to deprive Aéropostale of any intangible interest, as opposed to only the right to control interest. He contends this is a due process violation because the instruction was "broad, vague, and indefinite," and "so formless and malleable that it essentially renders the property element insignificant." (Def.'s Ltr. Mot. at 2.)

In this same vein, Finazzo also argues that the Court's instruction was erroneous because it did not limit the "intangible interests" constituting "property" under the statute to "intangible property interests." As such, he contends, the jury was allowed to convict him "upon a finding

that he deprived Aéropostale of *any* intangible interest." (Def.'s Ltr. Mot. at 2 (emphasis in original).) Both of these arguments fail for the same reasons.

The Court's charge, in its entirety, makes no mention of any intangible right protected by the fraud statutes other than the "right to control the use of one's assets." (Court Ex. 1.) Moreover, as the government points out, the verdict sheet did not permit the jury to speculate as to what intangible interest Finazzo contemplated harming; rather, it required the jury to find whether its convictions were based on Aéropostale's specific and clearly protected "right to control use of its assets." (*Id.*) As explained above, the verdict sheet required the jury to indicate whether each conviction was "on the basis of intent to deprive Aéropostale of money" and "on the basis of Aéropostale's right to control use of its assets." (*Id.*) There being no possibility that the jury convicted Finazzo on any basis other than a finding that Finazzo intended to deprive Aéropostale of the right to control use of its assets, any error – if one exists at all – in the Court's specific phrasing of the instruction was harmless.

    3.  Content

Finazzo's second argument requires more extensive consideration. He argues that the Court's charge is at odds with the Second Circuit's guidance on what constitutes property under the fraud statutes as set forth in *United States v. Mittelstaedt* because, as the *Mittelstaedt* court stated, a "lack of information that might have an impact on the decision regarding where . . . money is spent, without more, is not a tangible harm and therefore does not constitute a deprivation of section 1341 'property.'" 31 F.3d at 1217. The Court disagrees with Finazzo's conclusions.

A recitation of *Mittelstaedt* is helpful so as to give context to this argument. The defendant in that case, John Johnsen, was a consulting engineer for a village in New York. In

that role, Johnsen provided advice and recommendations on a range of public engineering matters. He exploited that position by influencing "planning boards improperly in respect of projects in which he had a secret interest." 31 F.3d at 1211. Specifically, Johnsen learned of the municipality's plan to add parking in the village center and had knowledge of the specific areas that the village planned to develop for this purpose. Armed with that inside information, Johnsen's co-conspirator purchased property that the village had specifically designated for parking development before the development plans were made known to the general public. The co-conspirator in turn entered into an agreement with the town to sell the property for $77,000 more than his purchase price. Johnsen and his co-conspirator were equal partners in the venture. *Id.* at 1214.

The government charged Johnsen with seven counts of mail fraud, alleging that he had concealed his ownership interest in the property with the intent to deprive the town of "the right to material information concerning the expenditure of public monies . . . [and] confidential business information concerning [the village's] plan to build a village parking lot." *Id.* at 1216 (brackets in original). The indictment also charged Johnsen with intending to defraud the village of more than $75,000 in profit from the sale of the property. *Id.* Following a trial, Johnsen was convicted.

On appeal, Johnsen challenged the district court's jury instruction that "the right to material information concerning the expenditure of public monies, is a property right, intangible though it is, and it is included in the mail fraud statute." *Id.* In agreeing with Johnsen that the court's instruction permitted a jury to convict him "for nothing other than a breach of a fiduciary duty," the Second Circuit reasoned that a "lack of information that might have an impact on the decision regarding where government money is spent, *without more*, is not a tangible harm"

protected by the fraud statutes. *Id.* at 1218, 1217 (emphasis added). The court explained that, "where an individual standing in a fiduciary relation to another conceals material information that the fiduciary is legally obliged to disclose, that non-disclosure does not give rise to mail fraud liability unless the omission can or does result in some tangible harm." *Id.* at 1217. The court added that "to convict, the government had to establish that the omission caused (or was intended to cause) actual harm to the village of a pecuniary nature or that the village could have negotiated a better deal for itself if it had not been deceived."[6] *Id.*

This Court does not read *Mittelstaedt* to require the intent to deprive the victim of a "tangible harm" in addition to the deprivation of the "right to control," as Finazzo urges. (Reply Br. at 4.) Rather, the *Mittelstaedt* court was emphasizing merely that there is a materiality requirement inherent in the fraud statutes. Simply not disclosing information that appears relevant to economic decision-making, "*without more*," does not violate the fraud statutes. 31 F.3d at 1217 (emphasis added). If, however, the non-disclosure "*can or does result* in some tangible harm," then the non-disclosure gives rise to liability. *Id.* (emphasis added). Critically, the *Mittelstaedt* court explained that "to be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction." *Id.* (citing *Carpenter*, 484 U.S. at 27). By explaining when undisclosed information is material, the court implied that the "something more" required to procure a fraud conviction simply stated a materiality requirement. *See Neder v. United States*, 527 U.S. 1, 4 (1999) (holding, five years after *Mittelstaedt* was decided, that materiality is an element of the mail and wire fraud statutes).

---

[6] It is axiomatic that proof of success is not an element of the fraud statutes. *See Dinome*, 86 F.3d at 283 ("[T]he government need not prove that the scheme successfully defrauded the intended victim."); *D'Amato*, 39 F.3d at 1257 ("The scheme to defraud need not have been successful or complete."); *Regent Office Supply Co.*, 421 F.2d at 1180 (explaining that the government need not prove that the victim was actually defrauded); *United States v. Sancho*, 957 F. Supp. 39, 41 (S.D.N.Y. 1997).

Information is material when it would "bear on the ultimate value of the transaction" or, as this Court instructed the jury and other courts agree, when the information "would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision." (Court Ex. 1 at 23); *see also Dinome*, 86 F.3d at 277 (approving jury instruction that "a material fact is one which would reasonably be expected to be of concern to a prudent person in making a decision"). As such, this Court's instructions to the jury were in accord with *Mittelstaedt* and the law in the Second Circuit.

Other Second Circuit cases support this Court's conclusion. One, *Dinome*, is particularly instructive. There the defendant, Wayne Hellman, misrepresented his income on an application for a home mortgage. 86 F.3d at 279. The district court rejected the defendant's proposed instruction that "[a] scheme to defraud must have as its goal a financial loss to the victim," and instead instructed the jury that the misrepresentations made in carrying out the scheme must be material, *i.e.* the misrepresentations must be such "that a reasonable person might have considered [them] important in making a decision." *Id.* at 280. The district court also instructed the jury regarding what property is protected by the fraud statutes, stating: "Under the mail fraud statute, the definition of property includes intangible property interests such as the right to control the use of one's assets. This interest is injured when a person is deprived of information he would consider valuable in deciding how to use his assets." *Id.* Hellman was convicted of one count of wire fraud and one count of mail fraud. *Id.* at 279.

On appeal, the defendant argued that the district court had improperly instructed the jury on the right to control theory. Relying on *Mittelstaedt*, the defendant contended that a jury should not have been able to convict him without the government proving beyond a reasonable doubt that he intended to injure the bank financially. The Second Circuit rejected Hellman's

argument.  While noting that the district court's instruction that a protected property interest under the fraud statutes "is injured when a person is deprived of information he would consider valuable in deciding how to use his assets" appeared "facially at odds with *Mittelstaedt*'s statement that 'lack of information that might have an impact on the decision regarding where government money is spent, without more, is not a tangible harm'" protected by the fraud statutes, the court nevertheless proceeded to distinguish *Mittelstaedt*.  The instructions in *Mittelstaedt* allowed the jury to convict "solely upon the disinclination of the municipal authorities 'on general principles' to deal with an insider who had abused his fiduciary position." *Id.* at 284 (quoting *Mittelstaedt*, 31 F.3d at 1218).  In *Dinome*, however, there was testimony that the bank would not have extended a loan to the defendant if it had known his income did not actually meet certain requirements.  86 F.3d at 284.  Since the district court's instruction that Hellman's income information had to be valuable to the bank in deciding how to use its assets was coupled with the fact that the information withheld diminished the value of the mortgage transaction "to the bank as defined by its standard lending practices," the Second Circuit rejected the defendant's challenge to the jury instructions.  *Id.*

Reading *Mittelstaedt* and *Dinome* together, it becomes clear why Johnsen's conviction in *Mittelstaedt* had to be reversed, but Hellman's in *Dinome* was upheld.  The court reversed in *Mittelstaedt* because the jury could convict for a mere withholding of information when it was not instructed both that the information withheld had to be material and under what circumstances such information is considered material.  The *Dinome* court understood *Mittelstaedt* this way, too, when approving the instructions in *Dinome* and explained that the information withheld had to be valuable to the victim when deciding how to use its assets.  86

F.3d at 284.  While that instruction appears to have been absent in *Mittelstaedt*, it was properly included in the case at bar.

The facts of this case are thus more akin to *Dinome* than *Mittelstaedt*, and Finazzo's attempts to distinguish *Dinome* are unavailing.  Like *Dinome*, there was ample testimony here that knowledge of and information about Finazzo's relationship with South Bay would have been vital to Aéropostale's economic decisions regarding whether, and at what price, to do business with South Bay.  As recited above, Cunningham, Slezak, and Geiger all testified that Aéropostale would have wanted to know about Finazzo's interest in South Bay in order to evaluate the fairness of the transaction and ensure that Aéropostale was getting the best prices from South Bay.  Taken together, the evidence and the Court's charge prevented the jury from convicting Finazzo for "deceiving [Aéropostale] in an immaterial way" – the flaw in *Mittelstaedt* that was corrected in *Dinome*.  *Dinome*, 86 F.3d at 284.

Finazzo first attempts to distinguish *Dinome* by pointing out that *Dinome* did not involve a non-disclosure, as was the case here and in *Mittelstaedt*.  (Reply Br. at 11.)  That factual difference need not detain this Court, however, because in addition to failing to disclose his interests in South Bay, Finazzo also made *affirmative* misrepresentations regarding his relationship with South Bay when he provided false answers to questions on his D&O questionnaires and related-party transaction forms.  For example, on multiple occasions, Finazzo answered "No" to the question "[H]ave you or anyone in your immediately family had [sic] a material financial interest (more than any 10-percent interest in an entity that the company transacts business with) in a transaction or a proposed transaction to which Aéropostale was or is to be a party to?"  (Tr. 90; 91-92.)

Additionally, Finazzo argues that *Dinome* is distinguishable because the evidence in that case showed that the victim would never have transacted with the defendant had it known Hellman's true financial condition, while the evidence in this case established only that Aéropostale might not have entered into the transactions with South Bay at the agreed-upon prices if it had known of Finazzo's interest in South Bay. But the neither instruction upheld in *Dinome* nor the instruction given by this Court requires such transactional certainty on the part of the victim. The information withheld need only be valuable to the victim when deciding how to use its assets; that is, the victim need only be deprived of "potentially valuable economic information" or information "that could impact on economic decisions." *D'Amato*, 39 F.3d at 1257. There is no requirement that the information withheld *must* have impacted the victim's economic decisions or that, as Finazzo would have it, there be "solid proof of the actual, identifiable, monetarily better deal" that Aéropostale could have gotten elsewhere. (Reply Br. at 14.) Yet even on that score Finazzo's argument is questionable, as the government provided ample evidence during trial of competing merchandise available through vendors other than South Bay.

Even putting aside the Court's efforts to reconcile *Dinome* and *Mittelstaedt*, there is another reason to question the applicability of *Mittelstaedt* to this case. The court in *United States v. Levis* questioned *Mittelstaedt*'s language that withheld information "must have some independent value or must bear on the ultimate value of the transaction" in order to satisfy the materiality requirement. 488 F. App'x at 486 (couching its recitation of *Mittelstaedt* with "[e]ven if this was an appropriate statement of the law . . . ."). In *Levis*, the defendant misrepresented the financial condition of his company by telling potential investors that it had twice been evaluated independently, when in fact only an internal valuation had been performed.

*Id.* The defendant argued that the district court erred in failing to instruct the jury with the above language from *Mittelstaedt*. *Id.* In questioning *Mittelstaedt*'s formulation of the law, the court noted that *Mittelstaedt*'s "compelling factual setting" involving the ethical and fiduciary obligations of a government employee, adding that the fraud statutes "do not criminalize government ethics law." *Id.* at 486 n.2. The court also explained that in misrepresenting that his company had been valued by two independent evaluators, the defendant deprived "actual and potential investors of information that had independent value and that had bearing on the ultimate value of [the company's] stock." *Id.* at 486. The court further elaborated that, even if the internal valuation of the company were in fact correct, the misrepresentation was still significant because "independent valuations would be of far greater significance to possible investors and would substantially affect the market value of [the company's] stock." *Id.*

*Levis* supports the Court's conclusions here. First, the case suggests that much of that in *Mittelstaedt* on which Finazzo hangs his hat is cabined to the particular facts presented there, and has been refined in later authority. Second and more importantly, as in *Levis* – and as Geiger, Cunningham and Slezak all testified – Finazzo's affirmative misrepresentations and non-disclosures had independent value and great significance to Aéropostale given Finazzo's control of merchandising. Finazzo's relationship with South Bay and his kickback arrangement with Dey certainly "had bearing on the ultimate value" of the transactions between Aéropostale and South Bay, even if the government did not prove that, in fact, Aéropostale paid higher prices directly as a result of the hidden relationship. *Levis*, 488 F. App'x at 486. *See also Fagan*, 821 F.2d at 1009 (upholding fraud conviction where defendant paid kickbacks to employee of the victim, and reasoning that, had the employee not violated his duty to disclose, the victim "might

have captured for itself" the value of the kickbacks; "this possibility clearly had some economic value").

Finally, a host of additional authority supports the Court's analysis here and, in light of the facts of this case, underscores the propriety of the jury charge. *See, e.g., Carlo*, 507 F.3d at 802 (upholding conviction on right to control theory where the defendant gave false and misleading information about his ability to obtain funding for a real estate project; such actions deprived the victim-real estate developer of "material information necessary to determine for themselves whether to continue their development projects, thereby continuing or increasing their exposure to the risk of the projects' failure"); *McDonough*, 56 F.3d at 391 (upholding conviction where defendant concealed a kickback scheme from the victim and concluding that a jury could find there was an intent to harm the victim from evidence that the defendant participated in the victim's economic decision-making "without disclosing his interest in receiving kickbacks");*United States v. Rodolitz*, 786 F.2d 77, 80-81 (2d Cir. 1986) (upholding mail fraud conviction where defendant withheld material information from an insurance company that prevented the company from "determining for itself a fair value of recovery"); *United States v. Reinhold*, 20 F. Supp. 2d 541, 559-61 (S.D.N.Y. 1998) (denying motion for judgment of acquittal and new trial on fraud convictions where defendant concealed information from the victim-lender about the financial viability of two companies; "the information concealed from [lender] was not . . . unimportant to its decisions as to how to allocate its assets").

4.  *Sekhar v. United States*

After briefing on this motion concluded, Finazzo submitted an additional letter calling the Court's attention to the recent decision in *Sekhar v. United States*, 133 S. Ct. 2720, No. 12-357

(2013).  In that case, the Supreme Court held that attempting to compel a person to recommend that his employer approve an investment does not constitute the "obtaining of property from another" under the Hobbs Act, 18 U.S.C. § 1951.  (*See* Def.'s Mem. in Support (Doc. No. 281).)  Finazzo contends that the Supreme Court's interpretation of the term "property" in *Sekhar* applies to the meaning of property under §§ 1341 and 1343.  This Court disagrees.

In *Sekhar*, the defendant threatened the general counsel of a state's employee pension fund that he would disclose the general counsel's alleged extramarital affair if the general counsel did not recommend that the pension fund invest in the defendant's company.  The defendant was convicted of extortion under the Hobbs Act, which subjects a person to criminal liability if he "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do."  18 U.S.C. § 1951(a). The Act defines "extortion" to mean "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  *Id.* § 1951(b)(2).

In reversing the conviction, the Supreme Court reasoned that the general counsel's recommendation to invest in the defendant's company was not "property" under the Hobbs Act because – as that Act so defines – "extortion" requires "obtaining property."  Thus, under the Hobbs Act a victim must "part with" his property and the extortionist must "gain possession" of it; logically, the Court explained the property extorted must therefore be "transferable – that is, capable of passing from one person to another."  133 S. Ct. at 2725 (internal quotation marks and citations omitted).  In reaching that conclusion, the Court relied on its previous construction of that term as set forth in *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393 (2003), where it had held that Hobbs Act property must be something that can be "exercised,

transferred, or sold." 133 S. Ct. at 2726. In so reasoning, the Court concluded that "[w]hether one considers the personal right at issue to be 'property' in a broad sense or not, it certainly was not *obtainable property* under the Hobbs Act." *Id.* (emphasis in original).

Finazzo does not explain why this Court should apply the meaning of property under the Hobbs Act to the fraud statutes at issue here, and a cursory analysis reveals at least two reasons why not. First, nothing in the text or history of either the fraud statutes or the Hobbs Act suggests that property should be given the same meaning. As the Court explained in *Sekhar*, the Hobbs Act is based on the common law definition of extortion. *See id.* at 2724-26. Likewise, the fraud statutes are based in part on the common law definition of their eponymous crimes. *See Neder*, 527 U.S. at 21-25. The underlying conduct criminalized by the Hobbs Act and the fraud statutes, however, is quite different and Finazzo has not demonstrated that these crimes should share common law roots, or even statutory definitions. Indeed, in his concurrence in *Sekhar*, Justice Alito indicated that "property" under the fraud statutes at issue in this case may *not* be interpreted in the same manner. *See Sekhar*, 133 S. Ct. at 2728 ("I do not suggest that the concepts of property under the mail fraud statute and the Hobbs Act are necessarily the same.") (Alito, J., concurring). Other courts have similarly opined. *See United States v. Debs*, 949 F.2d 199, 201 (6th Cir. 1991) (casting doubt on argument that property under the fraud statutes takes the same meaning as that under the Hobbs Act); *United States v. District Council of N.Y.C. & Vicinity of the United Bhd. of Carpenters & Joiners of Am.*, 778 F. Supp. 738, 755 (S.D.N.Y. 1991) (noting there is "little authority" for concluding that "property" takes the same meaning under the fraud statutes and the Hobbs Act and rejecting the defendants' argument that they do); *United States v. Local 560 (I.B.T.)*, 695 F. Supp. 1158, 1188 (D.N.J. 1988) (questioning whether Supreme Court decisions interpreting property under the fraud statutes extend to property under

the Hobbs Act); *but see Ne. Women's Ctr., Inc v. McMonagle*, 689 F. Supp. 465, 474 n.3 (E.D. Pa. 1988) (assuming, without deciding, that property has the same meaning in the Hobbs Act the fraud statutes as in the fraud statutes).

Second, differences in the text of the Hobbs Act and the fraud statutes strongly imply salient differences with respect to the types of "property" they encompass. Under the fraud statutes, anyone "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses" is guilty of a crime. 18 U.S.C. §§ 1341 and 1343. The Hobbs Act, however, focuses on "the obtaining of property from another . . . ." *Id.* § 1951(b)(2). Relying on these textual differences, *Sekhar* made clear that "property" under the Hobbs Act must be "obtainable property" – *i.e.* property capable of being exercised, transferred, or sold. 133 S. Ct. at 2725-26. In contrast, the text of the fraud statutes criminalizes carrying out a fraudulent *scheme* without requiring its success. *See* 18 U.S.C. §§ 1341 and 1343 (prohibiting "any *scheme or artifice* to defraud, or for obtaining money or property" (emphasis added)). Indeed, as noted earlier, there is no requirement that the government prove a defendant succeeded in executing a fraudulent scheme for the defendant to be found criminally liable under the fraud statutes. *See also* note 6, *supra*; *Dinome*, 86 F.3d at 283 ("[T]he government need not prove that the scheme successfully defrauded the intended victim.").

Other courts have also drawn this distinction. For example, the court in *Welch* reasoned that property under the Hobbs Act was different – and therefore distinguishable – from property under the fraud statutes. 327 F.3d at 1108 n.27 ("In contrast to the Hobbs Act, neither the mail nor wire fraud statute requires that a defendant 'obtain' property before violating the statute."). Similarly, the court in *United States v. Kincaid-Chauncey*, 556 F.3d 923 (9th Cir. 2009), found

property to have different meanings under the Hobbs Act versus sections 1341 and 1343, explaining that while "depriving another of property is a statutory prerequisite to a Hobbs Act violation," obtaining property is not an element of the fraud statutes. *Id.* at 941. It is thus unsurprising that Finazzo cannot cite a single case that has found a requirement under the fraud statutes that the "property" at issue must be "obtainable." Based on the foregoing and consonant with the approaches taken by other courts, this Court declines to extend *Sekhar* as Finazzo urges.

### B. *Broader than the Indictment*

Finazzo next argues that, even if the Court properly instructed the jury on what constitutes property under the mail and wire fraud statutes, the Court's instruction was impermissibly broad and went beyond the government's theory of the case, as set forth in S-2. Finazzo was not charged with defrauding Aéropostale of its "general 'right to control' its assets, he argues. (Reply Br. at 6.) Rather, Finazzo urges that he was charged with a very specific scheme to defraud, namely that:

> The defendant[] Christopher Finazzo . . . defrauded Aéropostale by: (1) depriving Aéropostale of the opportunity to make informed decisions, thereby preventing Aéropostale from seeking lower prices for merchandise it purchased from South Bay and the opportunity to select other vendors based upon price, quality and timely delivery; and (2) causing Aéropostale to pay higher prices on merchandise it purchased from South Bay than were available from other vendors, thereby increasing South Bay's profits and the amounts Dey paid Finazzo.

(S-2 ¶ 9.) This scheme, Finazzo contends, required that the government prove beyond a reasonable doubt that Finazzo deprived Aéropostale of the very specific, intangible property right "to make informed decisions" *and* caused Aéropostale to pay higher prices, which would be a deprivation of tangible property. Finazzo claims the jury was improperly instructed because the jury instructions did not discuss the right-to-control theory in terms of the specific language

used in S-2, resulting in a guilty verdict that nevertheless found that Finazzo did not intend to deprive Aéropostale of money. The Court disagrees.

First, the government was not required to prove that Finazzo deprived Aéropostale of both of the property rights enumerated in S-2. That the scheme was pled in S-2 in the conjunctive, instead of the disjunctive, is of no moment. The Second Circuit rejected this very argument in *McDonough*. There, the defendant was indicted for defrauding the victims of "1) money, property, and other things of value . . . and, 2) their right to control their money, property, and other things of value." 56 F.3d at 390. The district court instructed the jury that it could convict on either basis, however, and the defendant contended that the government was required to prove both because the indictment had charged the objects of the fraudulent scheme in the conjunctive. *Id.* The Second Circuit dismissed the argument as "meritless," reasoning that "federal pleading requires that an indictment charge in the conjunctive to inform the accused fully of the charges." *Id.* (quoting *United States v. McGinnis*, 783 F.2d 755, 757 (8th Cir. 1986) (internal quotation marks omitted)). As such, a "conviction under such an indictment will be sustained if the evidence indicates that the statute was violated in any of the ways charged." *Id.* (citations and internal quotation marks omitted). Because the defendant "could have been convicted under either" theory – that he deprived his victims of their money or of their right to control their money – the court then affirmed the convictions. *Id.*

*McDonough* squarely applies here. Finazzo was fully informed of the charges against him when S-2 was pled in the conjunctive, and the evidence presented at trial amply supported the jury's finding that Finazzo violated the fraud statutes in one of "the ways charged" –namely, by depriving Aéropostale of its right to control its assets. *Id.* That the indictment was amended to replace the word "and" with "or" in *McDonough* after the defendant raised this concern in the

district court is also of no consequence because, as the Second Circuit made clear, "even had the indictment not been amended, the conviction would stand." *Id.* Finazzo also chose not to raise this argument during any discussion of the Court's charge to the jury. As it was proper for the jury to convict Finazzo on either basis, his arguments are unavailing.

Finazzo next contends, in essence, that S-2 was constructively amended because the jury charge did not instruct the jury with language derived specifically from S-2. That Finazzo did not couch this argument in terms of a constructive amendment, however, displays its very weakness. An indictment is constructively amended "when the trial evidence or the jury charge operates to broaden the possible bases for conviction from that which appeared in the indictment." *United States v. Rigas*, 490 F.3d 208, 225 (2d Cir. 2007) (citations and internal quotation marks and alterations). To demonstrate a constructive amendment, a defendant "must show that the trial evidence or the jury instructions 'so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment.'" *Id.* at 227 (quoting *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003) (internal quotation marks omitted)). However, "'[w]here a generally framed indictment encompasses the specific legal theory or evidence used at trial,' there is no constructive amendment." *Id.* at 228 (quoting *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005)). Moreover, courts considering constructive amendment challenges "'consistently permit[] significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial.'" *Id.* (quoting *United States v. Patino*, 962 F.2d 263, 266 (2d Cir. 1992)) (emphasis omitted).

S-2 alleged that Finazzo deprived Aéropostale of its "opportunity to make informed decisions." (S-2 ¶ 9.) That language is plainly broad and general in nature. S-2 then goes on to

allege the effect of that deprivation, that it prevented Aéropostale from seeking lower prices from South Bay and from contracting with other vendors at lower prices. (*Id.*) This language gives context to the nature of the decisions to which S-2 refers, which respected whether to engage in business with South Bay or with other vendors and at what price to purchase products from South Bay. The jury instructions were more narrowly tailored. The Court instructed the jury that Aéropostale's right to control the use of its assets is injured when − and, notably, only when − it is "deprived of potentially valuable economic information it would consider valuable in deciding how to use its assets." (Tr. at 2412; Court Ex. 2a at 19.) The deprivation explained in the jury instruction was thus more specific than, and wholly encompassed by, the deprivation alleged in S-2. This alone provides sufficient grounds for rejecting Finazzo's argument. *See Rigas*, 490 F.3d at 228.

Moreover, the jury charge did not "so alter an essential element" of the mail and wire fraud offenses with which Finazzo was charged. *Id.* at 227. There is simply no difference between describing the object of Finazzo's fraudulent scheme as depriving Aéropostale of its "opportunity to make informed decisions" (S-2 ¶ 9) or as depriving Aéropostale of "potentially valuable economic information it would consider valuable in deciding how to use its assets," (Tr. 2412; Court Ex. 2a at 19). As such, the Court finds that all of Finazzo's arguments directed at the jury instructions and the indictment are insufficient to warrant granting his motions under Rules 29, 33, and 34. The Court properly instructed the jury on what constitutes intangible property protected by the fraud statutes, and the Court's instructions were both consistent with the terms of the indictment and appropriate given the specific facts of this case. Finazzo's motions with respect to his substantive mail fraud and wire fraud convictions are therefore without merit.

**CONCLUSION**

For the foregoing reasons, the Court DENIES in their entirety Finazzo's motions made pursuant to Rules 29, 33, and 34, as to Counts Two through Sixteen. All motions related to the forfeiture verdict will be addressed by separate Memorandum and Order.

SO ORDERED.

Dated: Brooklyn, New York
       January 14, 2014

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge